UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

MARY A. MATTHEWS
*on behalf of* CH,

    Plaintiff,

    v.                                                    Case No. 08-C-0703

MICHAEL J. ASTRUE,

    Defendant.

DECISION AND ORDER REVERSING COMMISSIONER AND REMANDING CASE

        Plaintiff, Mary A. Matthews, on behalf of her child, minor CH, seeks judicial review under 42 U.S.C. §§ 405(g) and § 1383(c)(3) of the Commissioner's denial of CH's application for Supplemental Security Income benefits.

        CH filed her SSI application on September 27, 2004, when she was thirteen years old. The application was denied, initially and on reconsideration. Consequently, CH requested a hearing, which Administrative Law Judge Gregory S. Pokrass conducted on June 14, 2007. Matthews and CH testified at the hearing and were represented by counsel. (*See* Tr. at 14.)

        On June 28, 2007, ALJ Pokrass denied CH's application. (Tr. at 14-22.) Matthews and CH requested review, but the Appeals Council denied the request on June 18, 2008, making the ALJ's decision the final decision of the Commissioner. (Tr. at 4.) Matthews, on behalf of CH, then filed this case.

        An individual younger than age eighteen is considered disabled for purposes of SSI benefits if she has a medically determinable physical or mental impairment that "results in marked and severe functional limitations" and which is expected to result in

death or has lasted or is expected to last for a continuous period of twelve months or more. 42 U.S.C. § 1382c(a)(3)(C)(i).

The Administration uses a three-step process to determine whether a child is disabled under § 1382c(a)(3)(C)(i). *See* 20 C.F.R. § 416.924(a). Step one is determining whether the child is engaged in substantial gainful activity. If so, the child is not disabled. If not, at step two the Administration considers whether the child's physical or mental impairments are severe, alone or in combination. If not severe, the child is not disabled. If severe, step three is determining whether the impairments "meet[], medically equal[], or functionally equal[] the listings." *Id.* The "listings" are appendix 1 of subpart P of part 404 to title 20, chapter III of the Code of Federal Regulations. The listings for adults describe impairments that are presumed severe enough to prevent the individual from doing any gainful activity; the listings for children describe impairments that are considered to cause marked and severe functional limitations that justify an award of benefits. 20 C.F.R. § 416.925(a). If the listings are met or equaled medically or functionally, and the impairment meets the duration requirement, the child is disabled. If not, the child is not disabled. 20 C.F.R. § 416.924(a), (d).

An impairment *meets* the requirements of a listing "when it satisfies all of the criteria of that listing." 20 C.F.R. § 416.925(c)(3). An impairment *medically equals* the criteria of a listing if (1) an impairment is described in the listings but certain findings are not met, and the child has other findings of at least equal medical significance; (2) the impairment is not described in the listing but is of equal medical significance to closely analogous listed impairments; or (3) if one impairment does not meet the listings but a

2

combination of impairments is at least of equal medical significance to those of a closely analogous listed impairment. 20 C.F.R. § 416.926(b)(1)-(3).

An impairment *functionally equals* the criteria of a listing if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. § 416.926a(a), (d). A claimant's functioning in activities is considered in six "domains": (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. § 416.926a(b)(1). A "marked" limitation "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities," or in other words "is 'more than moderate' but 'less than extreme.'" § 416.926a(e)(2)(i). One basis for a finding of a marked limitation is when a standardized testing score is at least two, but less than three, standard deviations below the mean, if the claimant's day-to-day functioning is consistent with that score. § 416.926a(e)(2)(iii). An "extreme" limitation is more than marked and exists when an impairment "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(3)(i). One basis for finding an extreme limitation is when a standardized test score regarding functions in that domain is three standard deviations or more below the mean, if the claimant's day-to-day functioning is consistent with that score. § 416.926a(e)(3)(iii).

The Administration considers how the claimant's functioning is affected during activities at home, school, or in the community. § 416.926a(b). The Administration looks at how "appropriately, effectively, and independently" the claimant performs her

3

activities compared to the performance of children the same age who do not have impairments. *Id.*

The Administration seeks information from parents and caregivers as well as school personnel regarding the effects of a child's impairments on her functioning. 20 C.F.R. § 416.924a(a)(2). Also, the Administration considers teacher questionnaires, achievement testing, and a child's Individualized Education Program. 20 C.F.R. § 416.924a(b)(7)Iii), (iii). For an individual under age eighteen, the Administration will accept as a statement of the claimant's symptoms a description given by the person most familiar with the individual, such as a parent. 20 C.F.R. § 416.928(a).

ALJ Pokrass proceeded through the three-step process. He found in CH's favor at steps one and two, finding that CH had the severe impairment of a learning disorder or cognitive disability. (Tr. at 17.) However, he found that she did not satisfy step three. (*See* Tr. at 18-22.) According to the ALJ, CH did not have an impairment or combination of impairments that met or medically equaled the criteria of a listing. (Tr. at 18-19.) Nor did she have an impairment or combination of impairments that functionally equaled a listing. Although she had a marked limitation in acquiring and using information, no other limitations were marked or extreme in the other domains. (Tr. at 19-22.) Thus, she did not meet the requirement of having a marked limitation in two or more domains or an extreme limitation in one domain. (Tr. at 22.) Accordingly, he concluded that CH had not been disabled within the meaning of § 1382c(a)(3)(C) at any time since the date of her application, September 27, 2004. (Tr. at 14, 22.)

This court's review is limited to determining whether the ALJ's decision was supported by "substantial evidence" and based on the proper legal criteria. *Scheck v.*

*Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). This court cannot reweigh evidence or substitute its judgment for that of the ALJ. *Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.* Such an error is committed if the ALJ fails to comply with the Commissioner's regulations and rulings. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he cannot select and discuss only evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The district court should remand the case if the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation marks omitted). However, a "sketchy opinion" may be

5

sufficient if it is clear the ALJ considered the important evidence and his reasoning can be traced. *Id.* at 787.

Matthews raises two issues: (1) whether the ALJ failed to properly consider Matthews's and CH's testimony and failed to support his credibility determination with substantial evidence; and (2) whether the ALJ failed to support with substantial evidence his determination that CH has a "marked" rather than an "extreme" limitation in the "acquiring and using information" domain.

(1) Credibility of Matthews and CH

An ALJ must consider a claimant's subjective complaints, if supported by medical signs and findings. *Clifford*, 227 F.3d at 871. But even if not substantiated by objective medical evidence, a claimant's testimony about the intensity or persistence of pain or other symptoms or their effect is not rejected as a result. SSR 96-7p. "[S]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3).

In evaluating credibility, the ALJ must comply with SSR 96-7p. *Brindisi*, 315 F.3d at 787. That ruling requires consideration of (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Further,

6

> [i]t is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, *quoted in Brindisi*, 315 F.3d at 787.

CH testified at the hearing that she was in ninth grade and although she liked and was getting good grades in math and art, she found World History hard and was probably getting a D in that subject, and a C in English. (Tr. at 244-45, 250.) She stated that her math and English classes were Special Education classes but World History was in a regular classroom. (*Id.* at 246.) CH said she received help from the Resource Room at her school and exam assistance upon request. (*Id.* at 247.) Teachers or aides explain the test instructions to her and then are available to answer her questions; she gets extra time to complete tests; and is permitted to use a calculator during tests as well as her notes. (*Id.* at 247-49.) According to CH, she does not have homework often and is always able to get her assignments in when they are due, although she sometimes needs help from the Resource Room. (*Id.* at 252.) A couple of times per week she stays after class and asks a teacher for help. (*Id.* at 253.) CH testified that in prior years, she had trouble with science and social studies classes. (*Id.* at 250.)

CH said she has friends her own age but previously her friends were younger than her. (*Id.* at 250-51.) Her chores at home include doing dishes and cleaning her room. (*Id.* at 254-55.) CH testified that she cooks almost everything—for instance, she can put a chicken into the oven to bake. (*Id.* at 255.) She likes braiding her girlfriends' hair and

7

she goes to the mall with her girlfriends without an adult accompanying them. (*Id.* at 256-58.) CH added that she was planning to get a job at Pick 'N Save. (*Id.* at 259.)

Matthews testified she was told by CH's teachers that CH's reading and development has peaked; at the time of the hearing CH was reading at a third or fourth grade level and had been at that level since third or fourth grade. (*Id.* at 261.) According to Matthews, although CH brings homework home rarely, when she does it is frustrating for CH and Matthews because CH "doesn't comprehend things and she doesn't retain what she reads so when it gets to the point of taking what you've read and doing a report or writing a summary on it, it just is extremely frustrating for her and for me, too." (*Id.* at 262.) Matthews said that if CH has to write a report, Matthews has to lead CH along in organizing her thoughts "because they're usually not organized in any sequence that would make a whole lot of sense." (*Id.*)

Matthews testified that in seventh and eighth grades CH's schooling focused on life skills more than academics; for instance, CH helped in the school office or with kindergartners or first graders. (*Id.* at 263-64.) Matthews believed CH's teachers passed her into the next grade because her work was modified to get her through it. (*Id.* at 264-65.)

According to Matthews, when CH and her younger brother attended the same middle school he would ensure that she had her lunch number and would make sure she got on the right bus. (*Id.* at 269.) Matthews noted that CH can make macaroni and cheese and helps in the kitchen especially on holidays; she can bake a cake from a box but not

8

from a recipe because she has trouble following the directions. (*Id.* at 270.) CH also helps buying groceries. (*Id.* at 272.)

Matthews testified that CH requires a lot of repetition to learn something. (*Id.* at 270.) CH is able to do laundry, but only after "six or eight times of going down with her, explaining how it works, when to put the soap in, what to set everything on." (*Id.* at 272.) Matthews noted that CH stays focused for only thirty or forty-five minutes and that it takes her "quite a while" to advance to the next level on a video game. (*Id.* at 271-72.)

According to Matthews, not until ninth grade was CH allowed to go somewhere alone with her friends because she is naive and very trusting. (*Id.* at 267-68.) Matthews estimated that CH is at about a sixth-grade level emotionally and seems more immature than her friends. (*Id.* at 268, 273.)

Matthews stated that CH was not allowed to apply to be a checker or bagger at Pick 'N Save until she was sixteen. (*Id.* at 275.) She added that CH goes to the "Y" about three times a week to swim and exercise. (*Id.* at 275.)

In his decision the ALJ noted that Matthews and CH testified at the hearing. (Tr. at 14.) He dealt with their credibility as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible.

(Tr. at 19.)

9

Recently, in *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), the Seventh Circuit stated that language nearly identical to the quote just above regarding testimony not being "entirely credible"

> is a piece of boilerplate that appears in virtually identical language in both these cases as well as in a third social security disability case argued to us the same day. It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness's testimony is "not *entirely* credible" yields no clue to what weight the trier of fact gave the testimony.

*Id.* at 921-22. The ALJ's denial of benefits was reversed and the case was remanded to the Administration. *Id.* at 925.

CH's case must be remanded as well because here, as in *Parker*, the boilerplate finding that Matthews's and CH's testimony was "not entirely credible" fails to provide any clue as to what weight the ALJ gave their testimony. The conclusory statement is meaningless; it fails to adequately explain what portions of the testimony the ALJ accepted or rejected.

Further, the ALJ failed to sufficiently discuss the various factors in SSR 96-7p that might apply, such as CH's daily activities, the duration and frequency of her limitations, factors that aggravate her limitations, or measures that CH uses to function (e.g., relying on her brother to ensure she would take the correct bus home, ensuring she had her lunch number, or utilizing Resource Room personnel when completing class assignments and preparing for tests). Though the ALJ mentioned SSR 96-7p, he did so only in conclusory fashion by stating simply that he had considered all of CH's symptoms "in accordance with

10

the requirements of 20 C.F.R. § 416.929 and SSR 96-7p." (Tr. at 19.) He did not discuss in writing *how* he had considered SSR 96-7p.

In addition, assuming that Matthews's and CH's testimony was considered credible in some part ("not entirely credible" seems to mean it was credible at least in part), the ALJ did not address the testimony he found reliable but unpersuasive. For instance, he did not discuss Matthews's testimony that she was told by teachers that CH's reading level had peaked at a third or fourth grade level, that completing CH's homework is frustrating because CH "doesn't comprehend things and she doesn't retain what she reads," and that CH must be led through writing reports because her thoughts are not organized. (Tr. at 262.) The ALJ did not address Matthews's testimony that CH's schoolwork was modified to get her through it. Nor did he address how CH has trouble following directions such as a recipe, that she requires much repetition to learn tasks such as doing laundry, or that she is at a sixth-grade level emotionally.

The ALJ referenced the testimony in his discussion of the domain of "interacting and relating with others" and wrote:

> The claimant testified that she has friends at school and at home. She said she goes to the mall with friends, and that she likes to work on people's hair. Mother testified that the claimant gets along with teachers and students. And while she feels the claimant still does not have mature skills to deal with situations, she does trust the claimant to go independent of adults.

(Tr. at 21.) He briefly mentioned that Matthews identified no limitations in health and physical well-being and that Matthews and CH acknowledged that CH has no physical problems and swims. (Tr. at 19, 21.) Moreover, he mentioned that Matthews believes CH is totally disabled. (Tr. at 19.) But, other than these notations, he made little to no

11

reference to Matthews's or CH's testimony. Of particular note, is the ALJ's failure to discuss the testimony regarding the domain of acquiring and using information. Thus, in addition to failing to explain his application of SSR 96-7p the ALJ did not discuss the testimony contrary to his findings or build a logical bridge between the evidence and his conclusion. Therefore, this court concludes that the ALJ's decision must be reversed with respect to the credibility of the testimony given by Matthews and CH.

### (2) Domain of Acquiring and Using Information

The "acquiring and using information" domain is the consideration of how well a child acquires or learns information and uses the information. 20 C.F.R. § 416.926a(g). School-age children age six through eleven "should be able to learn to read, write, and do math, and discuss history and science." § 416.926a(g)(2)(iv). They need to use those skills to demonstrate what they have learned, for example, by producing oral and written projects and solving math problems. *Id.* Adolescents age twelve through seventeen "should continue to demonstrate what [they] have learned in academic assignments" and be able to use what they have learned "in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation)." § 416.926a(g)(2)(v). They should be capable of expressing simple and complex ideas in learning and daily living situations as well as apply these skills in practical ways, such as carrying out instructions or preparing job applications. *Id.*

The ALJ's discussion of this domain reads:

> The undersigned finds the claimant has a "marked" limitation in this domain. The DDS medical consultants and the claimant's teachers seem to agree on this. As discussed in the summary of evidence, the claimant's IQ scores on recent testing and the 2007 IEP do not overwhelmingly suggest

> "marked," but since her WRAT3 scores were in the 67-70 range, and she reportedly leveled off at 7th or 8th grade, the undersigned is of the opinion that "marked" is justified. However, it certainly does not rise to the "extreme" category.

(Tr. at 20.) Again, the ALJ did not discuss Matthews's testimony regarding the amount of repetition CH requires to learn basic skills such as cooking, doing laundry, knowing her lunch or bus number, and how disorganized her thoughts are.

Although the ALJ mentions that CH's learning leveled off in seventh or eighth grade, he appears to have ignored the testimony of the IEP teacher and Matthews that the level at which CH peaked was a third- or fourth-grade reading and math. According to this testimony, CH had remained at that level for three or four years, with little to no progression forward. (*See* Tr. at 65, 93, 101, 140, 177, 187.)

Further, the ALJ does not indicate he considered the statements in the February 2004 and February 2007 IEP's. The former IEP stated that CH's "inability to retrieve previously learned information inhibits her ability in all academic areas." (Tr. at 140) Whereas, the February 2007 IEP stated that abstract concepts are difficult for CH to grasp and her "cognitive disability impedes her progress" (Tr. at 222). Nor did the ALJ indicate that he considered how much difficulty CH had in science and social studies or in World History, which were taught in a regular classroom rather than a special education classroom. Moreover, the February 2004 IEP confirmed that CH did "not grasp concepts in science and social studies," had "difficulty retaining math concepts over time, and "[w]hen a new concept is taught, she does not remember previous concepts without continuing practice/review." (Tr. at 135, 137.) Also, the February 2005 IEP stated that teachers did not believe CH could be fully independent regarding adaptive skills and that

13

her intellectual abilities measured in the fourth percentile. (Tr. at 177-79.) This evidence suggests that CH may not have the acquiring and using information skills expected of a six through eleven year old, let alone an adolescent, yet the ALJ failed to address it in this decision.

In addition, the ALJ did not resolve the differences between teacher Deb Zaffiro's 2004 and 2007 questionnaires regarding CH. The ALJ stated he gave Zaffiro's opinions more weight than that of the ninth grade teacher, because of her longer relationship with CH, but he did not discuss the two different questionnaires Zaffiro completed.

In October 2004, when CH was in seventh grade, her special education teacher, Zaffiro, rated CH as having a "very serious problem," which was the most severe rating on the form, in five areas under "acquiring and using information": understanding school and content vocabulary, reading and comprehending written material, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Tr. at 66, 72.) Zaffiro stated that CH "needs many, many repetitions to understand and complete tasks. Her curriculum is completely modified to meet her needs." (*Id.*) This questionnaire supports a finding of an extreme limitation in this domain.[1] However, in a similar questionnaire completed almost three years later, and

---

[1] Again, a marked limitation interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities, while an extreme limitation is more than marked and exists when an impairment interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities. § 416.926a(e).

14

more than one year since Zaffiro had taught CH,[2] Zaffiro changed her ratings to at most a "serious problem" in five areas—the step below "very serious problem." (Tr. at 103, 113.) The ALJ did not explain why he gave greater weight to the 2007 questionnaire, completed more than a year after Zaffiro had taught CH.

CH's ninth grade special education math teacher rated her as having a "serious problem" in four areas in the "acquiring and using information" category, which supports a marked limitation rather than extreme limitation, but he also commented that CH "has great difficult[y] accessing prior knowle[d]ge for application" (Tr. at 94), possibly supporting an extreme limitation. Similarly, although Zaffiro's 2007 questionnaire reflected at most "serious problem[s]" she commented that CH "needed many repetitions to master a skill." (Tr. at 103.)

ALJ Pokrass did not discuss how the evidence of CH's need for her brother's assistance regarding her lunch and bus numbers and use of a computer compared to the standard that adolescents should be able to use what they have learned in daily living situations without assistance. Nor did he discuss how the evidence of CH's inability to follow a recipe or exam directions compared to the standard that adolescents should be able to apply skills in practical ways such as carrying out instructions or preparing a job application.

---

[2] Zaffiro completed the questionnaire in the summer after CH had completed ninth grade at Milwaukee High School of the Arts, but Zaffiro had been CH's teacher at elementary/middle school Tippecanoe School, not in high school.

15

Although Dr. Joan Nuttall's evaluation of CH and several of her test scores[3] support a finding of marked rather than extreme impairment, the ALJ had to show that he considered the evidence suggesting that CH has more than a marked limitation in the domain of acquiring and using information. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Except for his references to CH's test scores along with the opinions of teachers and consultants, the ALJ did not discuss why he found a marked limitation rather than an extreme limitation.

For the reasons stated above,

IT IS ORDERED that the Commissioner's decision is reversed and this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 27th day of July, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

---

[3] Although Matthews initially argued that certain test scores were three standard deviations below the mean, in her reply brief she acknowledged that they were actually two standard deviations below the mean, which falls in the marked range rather than the extreme range per the regulations.

16